Anthony Mitchell
618 Painted Opus Place
North Las Vegas, Nevada 89084
(702) 884-0472
realanthonymitchell@gmail.com
Plaintiff, Pro Se

FILED / RECEIVED
ENTERED / SERVED ON
COUNSEL/PARTIES OF RECORD
OCT 19 2026
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ANTHONY MITCHELL, an individual,

Plaintiff,

v.

PROGRESS RESIDENTIAL BORROWER 6, LLC, a Delaware limited liability company; PROGRESS RESIDENTIAL MANAGEMENT SERVICES, LLC, a Delaware limited liability company; and PROGRESS RESIDENTIAL PROPERTY MANAGER, LLC, a Delaware limited liability company,

Defendants.

Case No.: 2:26-cv-03411-ART-DJA

**COMPLAINT FOR DAMAGES**

**JURY DEMAND**

Plaintiff Anthony Mitchell alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiff Anthony Mitchell, whose household includes four young children, rents a two-story North Las Vegas home from Defendants, three Progress Residential companies: the landlord, the property manager named in the lease, and the landlord's leasing broker. Since at least May 2026, and throughout the summer months, the home's air conditioning has not adequately cooled the three upstairs bedrooms. Plaintiff paid every month's rent, reported the problem in writing again and again, and gave access for every scheduled visit. Yet in August 2026, with the air conditioning still unrepaired, Progress asked Plaintiff to renew the lease for another 12 to 14 months at a higher rent. When Plaintiff asked on August 12 that the airflow work be completed before a new term

began, Progress's renewal staff answered that maintenance was outside its role. The renewal staff later forwarded Plaintiff's repair concerns to Progress's Las Vegas team, which did not reply.

2. Between May and October 14, 2026, Progress's own technicians and two outside HVAC contractors came to the home at least nine times. In May, Progress's technician and its first HVAC contractor found low airflow to the upstairs bedrooms and recommended duct boosters. The boosters were never installed. By September 1, Progress's resident portal showed the job as "Waiting on Parts," and in September the first contractor missed two appointments to install them. Progress then switched to a second contractor and blamed the first contractor for not addressing the HVAC problem in Plaintiff's home. The portal then no longer showed "Waiting on Parts," and Progress never addressed the disparity. On October 2, after at least five earlier visits, the second contractor's technician found air leaking from the attic ductwork and that the attic was receiving more cooling than the upstairs bedrooms. The system appeared to have been connected to the older ductwork with tape rather than sealed with mastic. On October 5, the technician described the same low upstairs airflow, saying that most of the system's air goes downstairs, and identified the underlying cause: the system was likely never professionally installed or air-balanced. The system was installed before Plaintiff moved in; on information and belief, Progress had it installed. The technician told Plaintiff that the technician would recommend to Progress that it be reinstalled and air-balanced.

3. Progress has not authorized that repair or answered Plaintiff's repeated written questions about it. Progress's own actions show that it knows the upstairs bedrooms are not adequately cooled: on the evening of October 2, it delivered two portable air-conditioning units and installed them in two upstairs bedrooms. The only repair Progress ultimately caused to be performed was the October 3 sealing, which used one bucket of mastic, sealed only part of the ductwork and, on information and belief, cost about $75. Progress approved that sealing only after Plaintiff sent Progress a draft of this complaint on September 28 and, on information and belief, in response to that draft. The

technician told Plaintiff more than once that Progress was unlikely to approve anything more. One of the portable units smelled strongly of animal urine and could not be used. After Plaintiff reported it, Progress collected that unit on October 13 without notice and did not replace it.

4. On October 14, four people inspected the system inside Plaintiff's home: the second contractor's technician and three Progress representatives, namely its operations manager, its repair technician and another representative who, on information and belief, works in Progress's legal department. After feeling the airflow at the upstairs vents, the operations manager and the repair technician agreed that the airflow problem remains. The Progress representatives declined to enter the third upstairs bedroom, where Plaintiff's children were sleeping, saying that it likely had the same issue and that they were already aware of it. The repair technician said the problem could easily be fixed by bending the vent louvers with needle-nose pliers. When Plaintiff said that Progress seemed to lean toward the cheapest possible solution rather than the best one, the repair technician nodded. The operations manager blamed the first contractor and said the second never told Progress the system needed reinstallation and an air balance. On October 5, that technician had told Plaintiff that the technician would recommend that work to Progress, and Plaintiff reported it to Progress in writing the same day. Looking at the air conditioner, Plaintiff remarked that it seemed a federal lawsuit against Progress was needed to get anything fixed. The operations manager laughed and, with a shake of the head, said, "No comment," without saying that Progress would fix the system. Before leaving, the Progress representatives said that Progress would get back to Plaintiff within 48 hours with a satisfactory resolution. Instead, Progress's next email, sent the next day, October 15, declared Plaintiff in default of the lease for copying Plaintiff's written notices about the unrepaired air conditioning to other Progress departments, including the customer-care address the lease designates for notices and Progress's legal department. It ordered Plaintiff to write only to its operations manager and warned that any further such emails could bring a final notice of default and a referral to its legal department. Under

the lease, a default allows Progress to end Plaintiff's right to occupy the home. In effect, Progress threatened Plaintiff's tenancy if Plaintiff kept sending written notices about the unrepaired air conditioning to anyone at Progress other than its operations manager. Progress also has not answered Plaintiff's written request that it verify Plaintiff's rental history for the home Plaintiff is moving to.

## II. PARTIES

5. Plaintiff Anthony Mitchell is an individual and a citizen of Nevada. Plaintiff is a tenant, under a written lease, of the single-family home at 618 Painted Opus Place, North Las Vegas, Nevada 89084 (the "Home"). Plaintiff brings this action for Plaintiff's own claims.

6. Defendant Progress Residential Borrower 6, LLC ("Landlord") owns the Home and is the landlord under Plaintiff's lease.

7. Defendant Progress Residential Management Services, LLC ("Management Services") is the property manager named in the lease. It operates a Las Vegas office. It receives tenants' maintenance requests and schedules inspections and repair vendors for the Home on Landlord's behalf.

8. Defendant Progress Residential Property Manager, LLC ("Property Manager") is Landlord's real-estate broker for the lease. Its licensed leasing staff communicated with Plaintiff about the tenancy and its renewal. In August 2026, that staff received and forwarded Plaintiff's written repair notices.

9. Management Services and Property Manager are the "Management Defendants." On information and belief, each Management Defendant is authorized to enter into rental agreements for the Home on Landlord's behalf and performs Landlord's obligations for the Home. All three Defendants together ("Progress") operate the resident portal, customer-care channels, and work-order and vendor-dispatch systems used for Plaintiff's tenancy. Each acts as the agent of the others with respect to the Home.

10. Progress's repair vendors, Reliance Heating & Cooling ("Reliance") and, beginning September 28, 2026, a replacement vendor (the "new vendor"), were sent to the

Home to diagnose and repair the air conditioning as Defendants' agents. On information and belief, Progress, acting through Management Services, selected the vendors, set and approved the scope of their work, and continued to use Reliance after its repeated failures (¶¶ 7, 9). Defendants remained responsible for the repair under the lease and Nevada law.

## III. JURISDICTION AND VENUE

### A. Subject-Matter Jurisdiction

11. This Court has diversity jurisdiction over this action. Plaintiff and Defendants are citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12. Plaintiff is a citizen of Nevada and is domiciled in Nevada. Plaintiff has lived in Nevada for several years and intends to remain in Nevada. Plaintiff holds a Nevada driver's license and is registered to vote in Nevada. Since 2024, Plaintiff and Plaintiff's household have lived at the Home in North Las Vegas, Clark County, Nevada, where Plaintiff pays rent. When Plaintiff leaves the Home, Plaintiff plans to move to another home in Nevada.

13. Each Defendant is a limited liability company organized under Delaware law. Each has its headquarters and principal place of business at 7500 North Dobson Road, Suite 300, Scottsdale, Arizona 85256. Each is registered with the Nevada Secretary of State only as a foreign company. No Defendant is organized under Nevada law.

14. On information and belief, none of Defendants' members is a citizen of Nevada. When a member is itself a company or other entity, the same is true of that entity's own members and owners, at every level of ownership.

15. Plaintiff bases that belief on a reasonable search of public records:

- Nevada Secretary of State records list the member of Progress Residential Borrower 6, LLC at Defendants' Scottsdale, Arizona headquarters.
- The same records list the members of Progress Residential Property Manager, LLC as Progress Residential PM Holdings, LLC, which is itself registered in Nevada only as a foreign company, and an individual at the same Scottsdale address.

- A 2024 federal court docket lists Progress Residential PM Holdings, LLC as the corporate parent of Progress Residential Management Services, LLC.
- None of these records identifies a member located in Nevada.

16. The full chain of Defendants' members is not public. It is known to Defendants.

17. The amount in controversy exceeds $75,000 as to each Defendant, exclusive of interest and costs. Defendants are jointly and severally liable for the harm alleged. Plaintiff seeks:

- compensatory damages up to the full rent and mandatory fees for the entire tenancy, about $52,230 in base rent plus fees, including the lost use of the Home, Plaintiff's supplemental-cooling costs and moving costs;
- an additional statutory amount of up to $2,500 for willful interruption of an essential service;
- an additional statutory amount of up to $2,500 for retaliation;
- damages, equitable relief and costs for deceptive trade practices; and
- punitive damages against each Defendant for fraud, oppression and malice.

These amounts arise from all ten causes of action: compensatory damages from each of them, the statutory amounts from the Third and Tenth, the deceptive-trade-practices relief from the Eighth, and punitive damages from the First, Second, Sixth, Seventh and Ninth.

**B. Personal Jurisdiction**

18. This Court has personal jurisdiction over each Defendant. Each Defendant purposefully does business in Nevada, and Plaintiff's claims arise directly from that Nevada business:

- Landlord owns the Home in Clark County, leased it to Plaintiff, and collects rent and fees from Plaintiff in Nevada.
- Management Services maintains an office in Las Vegas, holds a Nevada real-estate broker license, manages the Home, and received and handled Plaintiff's repair

requests. The lease designates it to accept service of process, notices and demands for Landlord.

- Property Manager holds a Nevada real-estate broker license and acted as Landlord's broker for the lease. Through its Nevada-licensed staff, it communicated with Plaintiff about the tenancy, the renewal and Plaintiff's repair notices.
- Each Defendant is registered with the Nevada Secretary of State to do business in Nevada.

19. Exercising jurisdiction over each Defendant is reasonable. The Home, the air-conditioning failure, the repair visits, the witnesses and Plaintiff's harm are all in Nevada.

**C. Venue**

20. Venue is proper in this District. The Home, the property at the center of this action, is in Clark County, Nevada. A substantial part of the events and omissions giving rise to the claims occurred there. Each Defendant is also subject to personal jurisdiction in this District.

21. This action is properly filed in this Court's unofficial Southern Division, in Las Vegas, because it arose in Clark County, Nevada, where the Home is located.

## IV. FACTUAL ALLEGATIONS

**A. The Lease and the Air Conditioning**

22. On August 4, 2025, Plaintiff and Plaintiff's co-tenant, Kytierra Clark, signed a lease renewal with Landlord for the Home. The term runs from October 6, 2025 through November 8, 2026.

23. The lease requires Landlord to maintain and repair the Home's air-conditioning system at its own expense. The lease treats lack of air conditioning that poses a health risk as an emergency.

24. The renewal lease states monthly rent of $2,130 for that term. Plaintiff's original lease for the Home, which ran from October 4, 2024 through October 5, 2025, set the rent at $2,045 a month. The renewal also requires two mandatory monthly fees

totaling $28.98: a $19.99 Smart Home Fee and an $8.99 Utility Service Fee. The renewal's first page lists the total monthly rent, including those fees, as $2,158.98. Plaintiff has paid the Smart Home Fee every month in addition to the stated rent, along with the other fees Progress billed.

25. The Home has two stories and three upstairs bedrooms. Its central air conditioning is controlled by a downstairs thermostat. The system cools the downstairs to the thermostat setting and then shuts off, while too little cooled air reaches the upstairs bedrooms.

26. As a result, during the affected periods, the central air-conditioning system left all three upstairs bedrooms excessively hot, often ten degrees or more hotter than the downstairs living area, and on that system alone they could not be used as bedrooms. Plaintiff made the main bedroom usable only by installing and running a window air conditioner at Plaintiff's own expense; the other two upstairs bedrooms had no supplemental cooling until October 2, 2026. During the same periods, the attic, which should be unconditioned space, was cooled to a lower temperature than the upstairs bedrooms without supplemental cooling (¶¶ 40, 49).

27. The City of North Las Vegas housing code requires the air conditioning in every dwelling to be capable of maintaining a room temperature of 70 degrees Fahrenheit at a point three feet above the floor in all habitable rooms. The three upstairs bedrooms are habitable rooms. During the affected periods, the Home's air conditioning was not capable of cooling them to that temperature. Since at least September 6, 2026, Plaintiff has tracked the temperatures in the Home with six digital temperature sensors: one in each of the three upstairs bedrooms, one in the play room, one in the downstairs living room next to the thermostat, and one in the garage, an unconditioned space. On October 5, 2026, Plaintiff moved the garage sensor into the attic, which should also be unconditioned space, to compare it with the upstairs bedrooms. The sensors showed the two upstairs bedrooms without Plaintiff's window air conditioner often ten degrees or more hotter than the living room next to the thermostat and, from October 5, the attic cooler than two of the

upstairs bedrooms (¶ 49). Plaintiff reported sensor readings to Progress in writing on October 4, 5 and 7, 2026 (¶ 56).

**B. Notice and Failed Repair Visits, May to September 1, 2026**

28. On or about May 25, 2026, Plaintiff reported the upstairs cooling failure to Progress in writing as an emergency. A Progress maintenance technician inspected the system first, including the attic, before Progress called in a technician from Reliance. They found low airflow to the upstairs bedrooms and recommended installing duct boosters. No repair followed.

29. On August 12, 2026, Plaintiff again reported the failure in writing, through a new work order and by email. Plaintiff asked that the email be treated as written notice. Property Manager's leasing staff replied that maintenance matters fell under Plaintiff's Account Manager and that Plaintiff could email Progress's Las Vegas team, and Progress opened a customer-care case for "Service concerns- HVAC."

30. On August 13, a Progress maintenance technician again inspected the system, including the attic, and confirmed the problem before Progress again called in Reliance. On August 19, at the Home, the Reliance technician told Plaintiff that, months earlier, Reliance had asked Progress to approve installing three duct boosters upstairs and that Progress had approved that request. The Reliance technician also said that the technician would submit a new ticket and return the following week to complete the installation. The Reliance technician did not return the following week. Whether Progress had in fact approved that request is known to Defendants and reflected in their records.

31. On August 24, 2026, Plaintiff sent further written notice to customer care, the Las Vegas team and Property Manager's leasing staff. Plaintiff asked for an installation date and for Progress's repair records, and offered access. That day, Progress's renewal assistant replied in writing that it would escalate Plaintiff's request to a colleague who could assist with scheduling the duct booster installation and provide the records, and that a team member would reach out to Plaintiff soon. Minutes later, Property Manager's staff wrote that the channel was not used for service-related concerns, and then forwarded

Plaintiff's notice to the Las Vegas team.

32. By September 1, 2026, Progress's resident portal showed the repair as "Waiting on Parts" and stated that parts had been ordered. Progress never identified any part or gave a delivery or installation date.

33. On August 29, 2026, Plaintiff filed a complaint about the condition with the City of North Las Vegas. The City referred it for investigation.

**C. Missed Appointments and Progress's Response, September 2026**

34. On September 14, 2026, Plaintiff told Progress in writing that Plaintiff would sue if the dispute was not resolved and sent Progress a draft complaint for filing in the Eighth Judicial District Court. Plaintiff kept Progress informed in writing throughout September 2026, including on September 16, 18, 20, 21, 25 and 28.

35. Reliance arrived on September 18 but did not perform the installation. It rescheduled the work for September 20, then did not come and gave no notice. It rescheduled again for September 25, and again did not come.

36. On September 25, 2026, Plaintiff notified Progress in writing that the air conditioning still was not cooling the upstairs bedrooms. Plaintiff stated that Plaintiff intended to hire a licensed contractor to make the repair if Progress did not, and to deduct the cost from rent.

37. On September 28, 2026, Progress responded in writing. It stated that it had 14 days from Plaintiff's September 25 correspondence to remedy the situation before Plaintiff could hire a contractor. It apologized that Reliance "did not appear for appointments as promised" and said it had "already contacted a new vendor." It also offered, for the first time, to drop off portable air-conditioning units "pending adjustment for the interior air flow."

38. The same day, Progress texted Plaintiff that a new work order, described as service "for indoor unit," was scheduled for September 30, between 1:00 and 5:00 p.m. The new vendor separately scheduled the visit with Plaintiff for October 2. Reliance also called Plaintiff that day, still trying to schedule the same work. After the switch,

Progress's resident portal no longer showed the repair as "Waiting on Parts." Progress never addressed the disparity between that status and its statement that Reliance "did not appear for appointments as promised."

39. Plaintiff accepted Progress's offer of portable units in writing the day Progress made it, September 28, 2026, and asked Progress to deliver two units for the two upstairs bedrooms that had no supplemental cooling.

40. On October 2, 2026, the new vendor's technician inspected the air-conditioning system. Within minutes, the technician found that the ductwork in the attic was leaking air. The technician also found that the system appeared to have been connected to the older ductwork with tape rather than sealed with mastic, a duct sealant, and that the attic was receiving more cooling than the upstairs bedrooms. Plaintiff saw that the tape on those connections was metal HVAC tape and that it had peeled back.

41. The system was installed before Plaintiff's tenancy began. On information and belief, the improper duct connection dates from that installation. The upstairs bedrooms were also inadequately cooled during the summer of 2025, before Plaintiff's written notices began in May 2026.

42. On information and belief, the system was not installed by a licensed HVAC contractor following professional standards. Plaintiff believes that Defendants' own maintenance personnel, or others acting for Defendants, installed it as a cost-saving measure. Plaintiff expects discovery, including Defendants' installation, permit and maintenance records, to confirm who installed the system, when, and how. Whoever installed it, Defendants were responsible for delivering the Home with the system in good repair and for maintaining it. On information and belief, Progress knew, and in any event should have known, when it leased the Home to Plaintiff in 2024 and renewed the lease in 2025, that the system had not been professionally installed, that its duct connections were taped rather than sealed with mastic, and that it had never been air-balanced.

43. The same day, the technician told Plaintiff that Progress had approved sealing the leaks, and scheduled that work for noon on October 3, 2026. Progress gave that

approval four days after Plaintiff emailed a draft of this complaint to Progress, including its legal department, on September 28, 2026, and, on information and belief, in response to that draft.

44. Before October 2, Progress's own technicians and Reliance had come to the Home at least five times since May 2026 without identifying or correcting the leaking ductwork. Progress's own technicians went into the attic during the May and August 13 inspections. They knew, or should have known, that the attic ductwork was leaking.

45. On the afternoon of October 2, 2026, Plaintiff wrote that none had been delivered and asked Progress to deliver them or say in writing that it had withdrawn the offer. At about 6:30 p.m. that evening, four days after Plaintiff accepted the offer, a Progress maintenance representative delivered two portable units and installed them in two upstairs rooms. That was more than four months after Plaintiff's May notice. Plaintiff has paid the electricity needed to run the units. While delivering the units, the maintenance representative told Plaintiff that leaking attic ductwork is easy to detect because the attic becomes cold. The representative also said that Reliance should have recognized and addressed the problem earlier, and that an experienced technician would find that problem quickly. The attic at the Home was cold.

46. On October 3, 2026, from about 12:30 to 1:45 p.m., the new vendor sealed part of the leaking attic ductwork with mastic. The technician took before-and-after meter readings at the same upstairs bedroom register, which showed only a slight improvement. On information and belief, the vendor billed about $75 for that repair.

47. The October 3 work was incomplete. The technician used one bucket of mastic and could reach only one side and the top of the ductwork connected to the system. The technician could not climb over the unit to reach the other side or reach fully underneath it. The remaining connections were not sealed, and the attic was still cool and receiving a portion of the air conditioning. The repair produced only a slight improvement in the upstairs bedrooms.

48. On October 5, 2026, the new vendor's technician returned to the Home for about 40 minutes. The technician stated that the system was likely never professionally installed, because its duct connections had been taped rather than sealed with mastic. The technician also stated that the system was likely never air-balanced, that most of the system's air goes to the downstairs, and that cooled air still leaks into the attic.

49. On information and belief, no air balance has ever been performed on the system. As a result, most of the system's air goes to the downstairs, cooled air continues to leak into the attic, and the upstairs bedrooms do not receive adequate airflow. Through at least October 9, 2026, the attic, which should be unconditioned space, remained cooler than two of the upstairs bedrooms, and on the clear afternoon of October 7, 2026, it was cooler than the outdoor air.

50. The technician told Plaintiff that the technician would recommend to Progress that the system be reinstalled and air-balanced. The technician identified the installation of dampers or baffles in the attic ductwork, to redirect air from the downstairs to the upstairs bedrooms, as a lesser alternative. Before October 14, the technician also told Plaintiff more than once that Progress was unlikely to approve that work, because the only work Progress had approved was the partial sealing described in paragraph 46.

51. By October 4, 2026, Plaintiff had reported in writing that one of the two units smelled strongly of animal urine, as if an animal had used it as a litter box. When it ran, the odor spread through the Home, so Plaintiff could not use it. On October 6, 2026, a Progress technician came to replace that unit without advance notice while Plaintiff was away. Speaking to Plaintiff through an exterior camera on the Home, the Progress technician said that he would return on October 9, 2026, between 1:00 and 5:00 p.m. No one came on October 9. On October 12, 2026, Progress's operations manager wrote that a visit on October 14 would "evaluate the portable air conditioning unit, including the concerns you have raised regarding odor and usability." At about 1:50 p.m. on October 13, 2026, a Progress representative collected the unit without advance notice. Progress did not replace it.

52. On information and belief, fully correcting the condition requires reinstalling the system and performing an air balance (¶¶ 48–50). Defendants have not authorized that work. No repair work has been performed since October 3, 2026. On October 5, 7, 9, 12 and 13, 2026, Plaintiff asked Progress in writing whether it would authorize the reinstallation and air balance. On October 14, 2026, Progress's operations manager, a Progress repair technician, another Progress representative who, on information and belief, works in Progress's legal department, and the new vendor's technician inspected the system at the Home for less than 20 minutes. The repair technician pointed a digital thermometer at the upstairs vents, and the other Progress representative photographed the repair technician holding the thermometer and its readings, which showed cool air coming out. Those readings measured only the temperature of the air leaving each vent. They did not measure how much air reached each bedroom or whether the system delivers air evenly throughout the Home. Cool air at a vent does not cool a room if too little of it arrives, and the upstairs bedrooms themselves stayed hot (¶¶ 25–27). Progress's own technicians had measured low airflow to the upstairs bedrooms in May 2026 (¶ 28). On visits before August 12, 2026, a technician had recorded the temperature downstairs near the thermostat and closed the ticket as functional. After holding their hands up to the upstairs vents, the repair technician and the operations manager agreed with Plaintiff that the upstairs bedrooms still have an airflow problem. The repair technician said that the airflow problem could easily be fixed by reaching into the vents with needle-nose pliers and bending the louvers toward where a person would be in the room. At the same inspection, Progress's operations manager, Brandon Ferguson, who on information and belief has held Nevada real-estate salesperson license no. S.0187678 and is affiliated with Property Manager, blamed Reliance for the failed repair and the missed appointments, and said that the new vendor had never told Progress that the system was improperly installed or needed an air balance. On October 5, the new vendor's technician had told Plaintiff that the technician would recommend that work to Progress, and Plaintiff reported that to Progress in writing the same day (¶ 50). Progress has not answered in

writing whether it will authorize the reinstallation and air balance.

53. During the October 14 inspection, Plaintiff explained that the problem is low airflow, and that bending the louvers was probably the cheapest way to improve the situation slightly but not the way to fix it. Plaintiff added that Progress seemed to lean toward the cheapest possible solution rather than the best one, and the repair technician nodded. Plaintiff invited the Progress representatives into the upstairs bedrooms to feel the airflow at the vents. They declined to enter the third bedroom, where Plaintiff's children were sleeping, saying that it likely had the same issue and that they were already aware of it. While looking at the air conditioner, Plaintiff remarked that it seemed a federal lawsuit against Progress was needed to get anything fixed. The operations manager laughed and, with a shake of the head, said, "No comment." The operations manager did not deny the remark or say that Progress would repair the system. Before leaving, the Progress representatives thanked Plaintiff for allowing them into the Home, shook Plaintiff's hand and said that Progress would get back to Plaintiff within 48 hours with a satisfactory resolution. Progress's next email to Plaintiff, the following afternoon, was the notice of default described in paragraph 68.

54. Progress could have assigned a different vendor or provided temporary cooling at any time after Plaintiff's May notice. It did neither until after Plaintiff told Progress on September 14 that Plaintiff would sue and on September 25 that Plaintiff would arrange the repair independently (¶¶ 34, 36).

55. Plaintiff has paid rent and has given access for every scheduled repair visit and inspection. Neither Plaintiff nor anyone in Plaintiff's household caused the problem. On September 1, 2026, Plaintiff gave timely notice of Plaintiff's intent to move out when the lease ends on November 8, 2026. Plaintiff remains in possession. On September 28, 2026, Plaintiff asked Defendants in writing to identify a mediator and dates by October 5, 2026, if they contended that the lease required mediation before suit. Defendants did not do so. All conditions precedent to Plaintiff's claims have been performed, have occurred, or have been waived or excused.

56. The duct boosters recommended in May 2026 have not been installed. Plaintiff gave Progress further written notice of the continuing condition on October 2, 4, 5, 7, 8, 9, 12 and 13, 2026. On October 7, 2026, Progress asked Plaintiff in writing whether the problems had been resolved, and Plaintiff answered the same day that they had not. More than 14 days have passed since Plaintiff's September 25, 2026 notice. Even after the October 3 and October 5, 2026 visits, the upstairs bedrooms remained inadequately cooled through at least October 12, 2026. The system has not been repaired.

**D. The Renewal Offer**

57. Beginning August 5, 2026, Progress repeatedly invited Plaintiff to renew the lease at a monthly rent of $2,215, for terms of 12 to 14 months. That was more than the $2,158.98 in rent and mandatory fees stated in Plaintiff's lease.

58. On August 12, 2026, in the same email thread as the renewal offer, Plaintiff told Progress's renewal staff in writing that Plaintiff intended to renew but could not sign the offer as written because of the unrepaired upstairs cooling failure. Plaintiff proposed a 14-month renewal at $2,090 a month, all-in, with the airflow work completed before the new term began, and wrote, "But I'd rather stay." Property Manager's renewal staff responded that maintenance matters, including the airflow, fell under Plaintiff's Account Manager, and that it would submit Plaintiff's proposed counteroffer to leadership for review.

59. On August 13, 2026, the day after receiving that notice, Progress's leadership team "respectfully declined" Plaintiff's offer. It stated that comparable homes in the Home's ZIP code typically rent for $2,275 to $2,500 for properties of about 1,750 to 2,000 square feet, and that it would not negotiate further. It did not offer to repair the air conditioning before a new term began, to reduce the rent until the repair was made, or otherwise to account for the Home's condition.

60. On August 12, 2026, the day before those statements, Progress was advertising three-bedroom homes in North Las Vegas at a median all-in rent of $2,090, including a home in the Home's ZIP code with the same three-bedroom,

two-and-a-half-bath layout at $2,120. Plaintiff pointed out those listings to Progress in writing that day (¶ 58).

61. Progress continued inviting Plaintiff to renew at the higher rent through at least September 8, 2026, while the air conditioning remained unrepaired. Progress thus sought to rent Plaintiff the same home for another term of 12 to 14 months, at a higher rent, knowing that its air conditioning could not cool the upstairs bedrooms and without any commitment to complete the repair before the new term began.

**E. Plaintiff's Harm**

62. Plaintiff lives in the Home with a household that includes four young children. During the affected periods, the central system left the upstairs bedrooms too hot to use without supplemental cooling. The household therefore slept together in the main bedroom, the one upstairs bedroom Plaintiff could cool, using a window air conditioner that Plaintiff installed and ran at Plaintiff's own expense. The other two upstairs bedrooms had no supplemental cooling until October 2, 2026.

63. Plaintiff lost the ordinary use and rental value of a substantial part of the Home. At a minimum, Plaintiff's damages include the share of the rent and mandatory fees Plaintiff paid from May 25, 2026, until the condition is corrected or Plaintiff's tenancy ends, that is attributable to the habitable rooms that did not meet the City's cooling requirement. Because Progress leased and renewed the Home with an air-conditioning system that, on information and belief, it knew, and in any event should have known, had not been professionally installed, sealed or air-balanced (¶¶ 41–42), Plaintiff seeks damages up to the full rent and mandatory fees for the entire tenancy, from October 4, 2024, through November 8, 2026: about $52,230 in base rent (12 months at $2,045 a month under the original lease and 13 months at $2,130 a month under the renewal), plus the mandatory monthly fees. How much of that rent reflects value Plaintiff did not receive is for the jury to decide. Plaintiff also paid additional electricity and other supplemental-cooling costs. Plaintiff had offered to renew the lease, at a lower rent, if the airflow work was completed first (¶ 58). Because Progress did not commit to completing

the repair before a new term began and instead sought a higher rent for the unrepaired home, Plaintiff gave notice and is moving out, and Plaintiff's damages also include the cost of moving to another home (¶¶ 55, 57–61).

**F. Progress's Notice of Default**

64. On October 12, 2026, Progress's operations manager wrote to Plaintiff: "Moving forward, I will be your primary point of contact regarding this matter and will coordinate all communications related to your concerns." The email did not ask Plaintiff to stop writing to anyone else at Progress. Plaintiff replied the same day that Plaintiff would address future emails to the operations manager and keep the other recipients copied.

65. On October 13, 2026, Plaintiff sent the operations manager two courteous written notices about the condition, the collection of the portable unit that day, and the October 14 visit (¶¶ 51, 56). Plaintiff copied the notices to other Progress email addresses, including Customer Care and Progress's legal department, because many of Plaintiff's written notices had gone unanswered, including Plaintiff's written questions of October 5, 7, 9 and 12 about the reinstallation and air balance (¶ 52).

66. The lease names Customer Care's email address as the address at which Management Services, the property manager named in the lease, receives demands and notices, and it allows notices to be sent by email.

67. Plaintiff has applied to rent another home for when Plaintiff leaves the Home. On October 12, 2026, that home's property manager told Plaintiff that it had emailed Progress's Customer Care address a request to verify Plaintiff's rental history. Plaintiff then asked Progress in writing, at its rental-verification and Customer Care addresses, to complete the verification by October 14, 2026, and authorized Progress to release Plaintiff's rental history. On information and belief, the prospective property manager followed up with Progress several more times. Progress has not answered Plaintiff's request and, on information and belief, has not answered the prospective property manager's requests.

68. On October 15, 2026, the day after the inspection, the operations manager emailed Plaintiff, at 2:32 p.m. from bferguson@rentprogress.com, a "First Notice of Default for Interference with Business Operations." The notice cited Plaintiff's October 13 notices and the Progress addresses Plaintiff had copied, including Customer Care and Progress's legal department. It quoted a lease provision that bars a resident from disrupting or interfering with Landlord's business operations and from communicating with Landlord's employees "in an unreasonable, discourteous, rude or hostile manner." It told Plaintiff, "In the future, you are permitted to email only myself relating to this specific issue," and warned that further conduct could lead Progress to "issue a Final Notice of Default and refer this matter to Legal." Among the addresses the notice called improper was Progress's rental-verification address, where Plaintiff's verification request was pending (¶ 67).

69. Plaintiff was not in default. Plaintiff's notices did not disrupt or interfere with any inspection or repair. Plaintiff was home and gave access for the October 14 inspection, as Plaintiff has for every scheduled visit, and Plaintiff has paid every month's rent (¶¶ 52, 55).

70. Under the lease, a resident's default allows Landlord, in accordance with applicable law, to terminate the resident's right to occupy the home, retake possession of it and declare the remaining rent for the lease term immediately due. Progress issued the notice two days after Plaintiff's October 13 notices, after months of Plaintiff's written notices about the condition, after Plaintiff's complaint to the City of North Las Vegas, and 17 days after Plaintiff sent Progress a draft of this complaint (¶¶ 33, 43, 56).

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: FAILURE TO MAINTAIN A HABITABLE HOME

NRS 118A.290 and 118A.355

Against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC

71. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

72. **Duty.** Landlord was required to keep the Home fit to live in and its supplied air conditioning in good repair (¶¶ 22–23).

73. **Unfit condition.** The air conditioning did not adequately cool the three upstairs bedrooms, and without supplemental cooling those rooms could not be used as bedrooms. The Home also failed the City's housing-code requirement that air conditioning be capable of maintaining 70 degrees in all habitable rooms, which makes a dwelling not habitable (¶¶ 25–26, 27, 56).

74. **Written notice.** Plaintiff gave Defendants written notice of the condition in May, on August 12 and on August 24, 2026, and repeatedly in September and October 2026 (¶¶ 28–31, 34, 36, 56).

75. **Failure to remedy.** Defendants did not correct the condition, or make their best efforts to correct it, within 14 days after any of those notices (¶¶ 28, 30–32, 35, 37–56).

76. **Harm.** As a result, Plaintiff lost use and rental value of the Home and paid supplemental-cooling costs (¶¶ 62–63).

77. **Liable Defendants and why.** Progress Residential Borrower 6, LLC ("Landlord") is liable as the owner and landlord of the Home. Progress Residential Management Services, LLC ("Management Services") and Progress Residential Property Manager, LLC ("Property Manager") are liable for two reasons: Management Services managed the Home and handled the repair process for Landlord, and Property Manager received and forwarded Plaintiff's repair notices as Landlord's leasing broker; and, on information and belief, each was authorized to enter into rental agreements and perform Landlord's obligations for the Home (¶¶ 7–9, 29–31).

**SECOND CAUSE OF ACTION: FAILURE TO SUPPLY ESSENTIAL AIR CONDITIONING**

NRS 118A.380

Against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC

78. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

79. **Duty.** The lease required Landlord to supply working air conditioning (¶ 23).

80. **Failure to supply.** Defendants willfully or negligently failed to supply adequate air conditioning to the upstairs bedrooms. This made those rooms unfit to live in (¶¶ 25–26, 30–32, 35, 54, 56).

81. **Written notice.** Plaintiff gave Defendants written notice describing the failure on August 12, August 24 and September 25, 2026, and on October 4 and 5, 2026, among other dates (¶¶ 29, 31, 34, 36, 56).

82. **Failure to remedy within 48 hours.** Defendants did not correct the failure, or make their best efforts to correct it, within 48 hours after any of those notices, excluding weekends and legal holidays (¶¶ 30–32, 35, 37–56).

83. **Harm.** As a result, Plaintiff lost use of the upstairs bedrooms and suffered a reduction in the Home's fair rental value (¶¶ 62–63).

84. **Liable Defendants and why.** Each Defendant — Progress Residential Borrower 6, LLC, Progress Residential Management Services, LLC and Progress Residential Property Manager, LLC — is liable for the reasons stated in paragraph 77.

**THIRD CAUSE OF ACTION: WILLFUL INTERRUPTION OF AN ESSENTIAL SERVICE**

NRS 118A.390

Against Defendants Progress Residential Borrower 6, LLC and Progress Residential Management Services, LLC

85. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

86. **Essential service.** Air conditioning is an essential service that Landlord was required to supply (¶ 23).

87. **Willful interruption.** Landlord and Management Services knew for months that the upstairs bedrooms lacked adequate cooling, yet willfully caused or permitted the interruption of adequate air conditioning to continue. They kept a vendor that repeatedly failed to appear, displayed an unexplained parts delay, and withheld a new vendor and temporary cooling until Plaintiff said that Plaintiff would arrange the repair independently (¶¶ 28–54).

88. **Harm.** As a result, Plaintiff suffered the losses described in paragraphs 62 and 63.

89. **Liable Defendants and why.** Progress Residential Borrower 6, LLC ("Landlord") is liable as the party required to supply the service. Progress Residential Management Services, LLC ("Management Services") is liable because it controlled the vendor assignments and repair scheduling that allowed the interruption to continue (¶¶ 7, 30–32, 35, 37–38).

**FOURTH CAUSE OF ACTION: BREACH OF LEASE**

Against Defendant Progress Residential Borrower 6, LLC

90. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

91. **Contract.** The lease is a valid contract between Plaintiff and Landlord (¶ 22).

92. **Plaintiff's performance.** Plaintiff paid rent and gave access for repairs (¶ 55).

93. **Breach.** Landlord did not maintain and repair the air conditioning, despite repeated notice and opportunities to repair (¶¶ 23, 28–56).

94. **Harm.** As a result, Plaintiff suffered the losses described in paragraphs 62 and 63.

95. **Liable Defendant and why.** Progress Residential Borrower 6, LLC ("Landlord") is liable as the party to the lease that promised to maintain and repair the air conditioning.

**FIFTH CAUSE OF ACTION: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Against Defendant Progress Residential Borrower 6, LLC (pleaded in the alternative to the Fourth Cause of Action)

96. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

97. **Contract and duty of good faith.** Under the lease, Landlord owed Plaintiff a duty to perform its repair obligations in good faith (¶¶ 22–23).

98. **Bad-faith performance.** Landlord may contend that its vendor dispatches and scheduling complied with the literal terms of the lease. Even if they did, Landlord performed in a way that defeated the purpose of the lease's repair and emergency provisions. It let appointments lapse and displayed an unexplained parts delay. It withheld a new vendor and temporary cooling until Plaintiff announced that Plaintiff would arrange the repair independently. It then claimed a new 14-day repair period, and it delivered temporary cooling only on October 2, 2026, including a unit that smelled of animal urine and could not be used, which it later collected without replacing it (¶¶ 30–32, 35–54).

99. **Plaintiff's justified expectation.** Plaintiff reasonably expected that a known emergency cooling failure would be diligently repaired (¶¶ 23, 28).

100. **Harm.** As a result, Plaintiff suffered the losses described in paragraphs 62 and 63.

101. **Liable Defendant and why.** Progress Residential Borrower 6, LLC ("Landlord") is liable as the party to the lease.

## SIXTH CAUSE OF ACTION: NEGLIGENCE

Against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC, each for its own conduct

102. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

103. **Duty.** Each Defendant owed Plaintiff reasonable care (¶¶ 6–9, 29, 31):

- Landlord, in maintaining the air conditioning.
- Management Services, in handling the repair requests, inspections and vendors that it undertook to handle.
- Property Manager, in handling the tenant communications that it undertook to handle, including Plaintiff's repair notices.

104. **Breach.** Each Defendant failed to use that care (¶¶ 28–54):

- Landlord did not get a known defect repaired.
- Management Services did not follow through on the recommended repair and kept a vendor that repeatedly failed to appear.
- Property Manager forwarded Plaintiff's notices without making sure they produced a repair response.
- Landlord and Management Services, through their technicians and vendor, came to the Home at least five times without finding the leaking, improperly sealed attic ductwork that the new vendor found within minutes, even though Progress's own technicians inspected the attic in May and on August 13 (¶¶ 40–44).
- Landlord and Management Services failed to use reasonable care in supervising and retaining Reliance, which repeatedly failed to appear and failed to identify the defect (¶¶ 10, 35, 45).
- On information and belief, Landlord and Management Services failed to have the system professionally installed and air-balanced, leased and renewed the Home with that defect, and have not authorized the reinstallation and air balance needed

to correct it (¶¶ 41–42, 48–50, 52).

105. **Violation of a safety code.** Landlord and Management Services also violated the City's housing-code cooling requirement (¶ 27). That requirement exists to protect occupants like Plaintiff from the harm Plaintiff suffered: habitable rooms too hot to use without supplemental cooling (¶¶ 26, 62).

106. **Causation.** Timely repair would have prevented or shortened Plaintiff's losses (¶¶ 28, 56–63).

107. **Harm.** Plaintiff suffered the losses described in paragraphs 62 and 63.

108. **Liable Defendants and why.** Each Defendant — Progress Residential Borrower 6, LLC, Progress Residential Management Services, LLC and Progress Residential Property Manager, LLC — is liable for its own failures described in paragraphs 104 and 105.

**SEVENTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION**

Against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC

109. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

110. **False representations.** Progress, directly and through its repair vendor, told Plaintiff that the recommended repair was approved and moving forward:

- On August 19, 2026, at the Home, Progress's vendor Reliance, acting for Progress, told Plaintiff that Progress had approved Reliance's earlier request to install three duct boosters, and that the technician would return the following week to complete the installation (¶ 30).
- By September 1, 2026, Progress's resident portal told Plaintiff that the repair was "Waiting on Parts" and that parts had been ordered (¶ 32).

111. **Falsity.** On information and belief, one or more of these representations was false or materially misleading when made. If Progress had not approved the installation, Reliance's representation that Progress had approved it was false. If no parts had actually

been ordered, the portal's representation that parts had been ordered was false. If no installation was actually scheduled or expected for the following week, Reliance's representation that the technician would return the following week to complete it was false or misleading. Whether any approval, parts order or installation schedule actually existed is within Defendants' records. Plaintiff bases this belief on three facts. On August 19, Reliance said it would submit a new ticket. Progress never identified any part, supplier, order date or delivery date. And on September 28, Progress opened a new work order and said it had contacted a new vendor, instead of completing the pending repair (¶¶ 30–32, 38).

112. **Knowledge.** On information and belief, Management Services knew the representations were false or misleading, or made them without a sufficient basis, because it administered the repair process and controlled or had access to the approval, parts-ordering, vendor and scheduling records for the repair. Landlord and Property Manager acted through Management Services and Reliance under the agency alleged in paragraph 9, and the knowledge those agents had within the scope of that agency is attributed to Landlord and Property Manager (¶¶ 7, 9–10).

113. **Intent to induce reliance.** The representations were made through Progress's repair process and repair vendor to induce Plaintiff to continue waiting for Progress's repair, remain available for appointments, and refrain from arranging an independent repair or pursuing other relief (¶¶ 34–36).

114. **Justifiable reliance.** Plaintiff relied on the representations. Taken together, Reliance's August 19 statements, the August 24 reply that Plaintiff's request would be escalated to a colleague who could assist with scheduling the duct booster installation, and the portal's "Waiting on Parts" status and statement that parts had been ordered led Plaintiff reasonably to understand that the boosters had been approved and ordered, and that the installation was waiting only on their delivery. Plaintiff had no access to Progress's internal records. Plaintiff kept waiting, remained available for each appointment, and did not arrange an independent repair until Plaintiff gave notice on

September 25, 2026 (¶¶ 30–36).

115. **Harm.** As a result, the cooling failure continued longer than it otherwise would have, and Plaintiff suffered continued loss of use and supplemental-cooling costs (¶¶ 62–63).

116. **Liable Defendants and why.** Progress Residential Management Services, LLC ("Management Services") is directly liable because it administered the repair process, directed the vendor that made the August 19 representations for Progress, and, with the other Defendants, operated the resident portal through which the parts representation was made. Progress Residential Borrower 6, LLC ("Landlord") is liable because the representations were made on its behalf, about its own repair obligation under the lease and Nevada law, by the agents performing that obligation. Progress Residential Property Manager, LLC ("Property Manager") is vicariously liable through the agency alleged in paragraph 9. To the extent Management Services, Reliance or others acting for Progress made the representations as Property Manager's agents, within the scope of that agency and through the portal, work-order and vendor-dispatch systems the Defendants operate together for the Home, Property Manager is liable for them. Property Manager also took part in the same repair communications: its leasing staff received and forwarded Plaintiff's repair notices, and the August 24 reply described in paragraph 114 came through the renewal channel its staff operated (¶¶ 6–10, 23, 29, 31).

**EIGHTH CAUSE OF ACTION: DECEPTIVE TRADE PRACTICES**

NRS 41.600 and NRS 598.0903 to 598.0999

Against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC

117. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

118. **Consumer transaction in the course of business.** Defendants lease, manage and broker rental homes as their business. Plaintiff rented the Home for the personal use of Plaintiff's household. Plaintiff paid rent and mandatory monthly fees,

including a Smart Home Fee, for the Home and the services that came with it, including maintenance and repair of its air conditioning (¶¶ 6–8, 22–24).

119. **Knowing violation of laws governing the lease.** Landlord and Management Services knowingly violated the state laws requiring a habitable home and working air conditioning, and the City's housing-code cooling requirement. Those laws govern the lease of the Home and its services. Landlord and Management Services knew of the violations from Plaintiff's repeated written notices and the inspections conducted through the repair process. Property Manager knew of the condition from the written repair notices that its leasing staff received and forwarded (¶¶ 8, 27, 28–36).

120. **Unconscionable practice.** Landlord and Management Services knowingly collected full rent and mandatory fees, month after month, for a home whose upstairs bedrooms could not be cooled to the City's standard. The result was a gross disparity between the value Plaintiff received and the rent Plaintiff paid. At the same time, Landlord, through Property Manager's renewal staff, sought to rent Plaintiff the same unrepaired home for another term of 12 to 14 months at $2,215 a month, more than Plaintiff was paying. On August 12, 2026, Plaintiff offered in writing to renew for 14 months at $2,090 a month, in line with Progress's own advertised rents for comparable homes, if the airflow work was completed before the new term began. The next day, Progress declined and said it would not negotiate further, without offering to repair the air conditioning first (¶¶ 26–27, 55, 57–63).

121. **False representations.** Progress, acting through Management Services and its repair vendor, also knowingly made the false or misleading repair representations described in paragraphs 110 and 111 (¶¶ 112, 116).

122. **Misrepresenting Plaintiff's legal rights.** On October 15, 2026, Progress's operations manager, Brandon Ferguson, wrote to Plaintiff from the Progress email address bferguson@rentprogress.com that Plaintiff was "permitted to email only myself relating to this specific issue," that is, only the operations manager. The same email declared Plaintiff in default of the lease for copying written notices to Progress's other

departments, including the Customer Care address that the lease names for notices and demands (¶¶ 65, 66, 68). The lease does not limit Plaintiff to writing to one employee. It allows notice by email to that Customer Care address, and Plaintiff had the right to give Progress written notice of the condition. Progress knew the terms of its own lease when it made that statement. Progress also misstated or omitted Plaintiff's rights on September 28, 2026. It told Plaintiff that it had 14 days from Plaintiff's September 25 notice before Plaintiff could hire a contractor (¶ 37). Plaintiff had given Progress written notice of the cooling failure months earlier (¶¶ 28–36). Even the general 14-day repair period requires a landlord to act more promptly when conditions require it in an emergency, and the lease itself treats a lack of air conditioning that poses a health risk as an emergency (¶ 23). For a failure to supply air conditioning that makes the premises unfit for habitation, a tenant's remedies arise if the landlord does not remedy the failure, or use its best efforts to do so, within 48 hours after written notice, excluding weekends and legal holidays (¶¶ 81–82). Progress's September 28 statement disclosed neither the emergency qualification to the 14-day period nor the separate 48-hour essential-service standard. Progress still did not complete the repair (¶¶ 46–47, 52, 56).

123. **Causation and harm.** As a result, Plaintiff paid rent and fees for value Plaintiff did not receive, and Plaintiff suffered the losses described in paragraphs 62 and 63.

124. **Liable Defendants and why.** Progress Residential Borrower 6, LLC ("Landlord") is liable because it collected the rent and fees and was bound to provide the services. Progress Residential Management Services, LLC ("Management Services") is liable because it managed the Home, controlled the repair and operated the portal that made the parts statement. Progress Residential Property Manager, LLC ("Property Manager") is liable for its part in the renewal offer; for the repair representations described in paragraph 121, through the agency alleged in paragraph 9 and described in paragraph 116; and, on information and belief, for the October 15 statement made by its affiliated operations manager (¶¶ 6–9, 52, 58–59, 68).

## NINTH CAUSE OF ACTION: CIVIL CONSPIRACY

Against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC (pleaded in the alternative to the agency allegations in paragraph 9)

125. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

126. **Two or more persons.** Defendants are three separate companies. To the extent they were not acting only as one another's agents, each acted for its own financial advantage. Landlord collected rent and fees. Management Services earned compensation for managing the Home. Property Manager earned compensation for leasing and renewals. Plaintiff alleges each company's compensation on information and belief (¶¶ 6–9).

127. **Concerted action.** On information and belief, Defendants agreed, expressly or tacitly, on a common course of action for the Home, which they carried out through shared systems and channels (¶¶ 9, 29, 31–32, 58–61):

- Property Manager's renewal staff received Plaintiff's written notices of the defect and referred or forwarded them to Management Services' Las Vegas team. On August 13, 2026, the day after Plaintiff's first written notice to the renewal staff, which offered to renew for 14 months at $2,090 a month if the airflow work was completed first, Progress's leadership declined that offer (¶¶ 58–59).
- Management Services let the repair lapse while the portal displayed an unexplained parts delay.
- Landlord continued to collect full rent and fees.
- Landlord, through Property Manager's renewal staff, continued to seek a higher-rent renewal of the same unrepaired home.

128. **Unlawful objective.** The object of that course of action was unlawful. It was to keep collecting full rent and fees, and to obtain a higher renewal rent, for a home Defendants knew violated state habitability law and the City's housing code, without

bearing the cost of timely repair (¶¶ 27, 61, 63).

129. **Purpose of harming Plaintiff.** Defendants pursued that objective knowing and intending that it would extract from Plaintiff rent and fees for value Plaintiff was not receiving (¶¶ 62–63).

130. **Harm.** As a result, Plaintiff suffered the losses described in paragraphs 62 and 63.

131. **Liable Defendants and why.** Each Defendant — Progress Residential Borrower 6, LLC, Progress Residential Management Services, LLC and Progress Residential Property Manager, LLC — is liable as a participant in the concerted course of action described in paragraph 127.

## TENTH CAUSE OF ACTION: RETALIATION

NRS 118A.510

Against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC

132. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

133. **Protected activity.** Plaintiff complained in good faith, in writing and repeatedly, to Progress that the Home's air conditioning was not adequately cooling the habitable upstairs bedrooms (¶¶ 28–36, 52, 56). On August 29, 2026, Plaintiff also complained in good faith about the condition to the City of North Las Vegas, which referred the complaint for investigation (¶ 33).

134. **Retaliation.** In retaliation, Progress declared Plaintiff in default of the lease on October 15, 2026, for copying Plaintiff's written notices to Progress's own departments, ordered Plaintiff to write only to its operations manager, and warned of a final notice of default and referral to its legal department. Because a default under the lease allows Landlord to terminate Plaintiff's right to occupy the Home and to retake possession, the notice threatened to terminate Plaintiff's tenancy and to bring an action for possession (¶¶ 64–70). In effect, the notice told Plaintiff that continuing to send written

notices about the unrepaired air conditioning to anyone at Progress other than its operations manager could cost Plaintiff the Home.

135. **No lawful cause.** Plaintiff was not in default. Plaintiff's notices were courteous, were sent to Progress's own email addresses, including the address the lease designates for notices, and did not disrupt or interfere with any inspection or repair (¶¶ 65, 66, 69).

136. **Timing and motive.** The notice came on October 15, 2026, two days after the notices it cited, 17 days after Plaintiff sent Progress a draft of this complaint, and a month after Plaintiff first told Progress that Plaintiff would sue. It also came the day after the inspection at the Home, where Progress's representatives said that Progress would get back to Plaintiff within 48 hours with a satisfactory resolution and Plaintiff remarked to the operations manager that it seemed a federal lawsuit was needed to get anything fixed. At the same time, Progress left unanswered the rental verification that Plaintiff's prospective landlord requested, and its notice called Plaintiff's emails to the rental-verification address improper while that request was pending (¶¶ 34, 43, 52, 53, 67, 68, 70).

137. **Relief.** Plaintiff is entitled to the additional statutory amount available for retaliation and to any actual damages proven at trial.

138. **Liable Defendants and why.** Progress Residential Borrower 6, LLC ("Landlord") is liable as the landlord. Each Management Defendant is liable because, on information and belief, it is authorized to enter into rental agreements for the Home on Landlord's behalf and performs Landlord's obligations for the Home (¶ 9). Management Services is the property manager the lease designates to receive Plaintiff's notices, and Progress's operations manager, who issued the notice, is on information and belief affiliated with Property Manager (¶¶ 7, 52, 66).

## VI. PUNITIVE DAMAGES

On the First, Second, Sixth, Seventh and Ninth Causes of Action, against Defendants Progress Residential Borrower 6, LLC; Progress Residential Management Services, LLC; and Progress Residential Property Manager, LLC

139. Plaintiff repeats, realleges, and incorporates by reference paragraphs 1 through 70 of this Complaint as if fully restated herein.

140. Landlord and Management Services knew for months, from repeated notices and inspections, that the upstairs bedrooms of a home with young children were too hot to use without supplemental cooling. Property Manager knew of the condition from Plaintiff's written repair notices and from the renewal communications in which Plaintiff raised the unrepaired upstairs cooling failure. Progress's own technicians and two outside contractors came to the Home at least nine times between May and October 14, 2026. Among other visits, Progress's own technicians inspected the system, including the attic, where leaking ductwork is easy to detect, in May and on August 13; its new vendor found the leaking attic ductwork on October 2, sealed part of it on October 3 and returned on October 5; and on October 14 a crew of four, three Progress representatives and the new vendor's technician, inspected the system at the Home (¶¶ 2, 8, 26–36, 40, 44–48, 52–53, 58, 62).

141. Landlord, acting through Management Services and the repair process it administered, could have assigned another vendor or provided temporary cooling at any time. It did neither until after Plaintiff told Progress on September 14 that Plaintiff would sue and on September 25 that Plaintiff would arrange the repair independently. Progress then claimed a new 14-day period before Plaintiff could hire a contractor (¶¶ 34, 36–37). Until October 2, the only supplemental cooling upstairs was the window air conditioner that Plaintiff installed and paid to run in the main bedroom, where the whole household slept (¶ 62). Even the temporary cooling Progress then provided was partial: one of the two portable units it delivered could not be used, and Progress later collected that unit without replacing it (¶¶ 45, 51). When Progress finally sent a different vendor, that vendor

found air leaking from the attic ductwork within minutes, and Progress approved sealing the leaks the same day. The partial repair Progress approved took about an hour and fifteen minutes and, on information and belief, cost about $75. Defendants have not authorized the work needed to complete the repair. When Progress's own repair technician inspected the system on October 14, 2026, and agreed that an airflow problem remains, Progress proposed only redirecting the bedroom vents (¶¶ 37–54).

142. From August 5 through at least September 8, 2026, Landlord, through Property Manager's renewal staff, sought to rent the same unrepaired home to Plaintiff for another term of 12 to 14 months at a higher rent, without regard to its condition (¶¶ 57–61).

143. Progress delivered temporary cooling units only on the evening of October 2, 2026, more than four months after Plaintiff's May notice, after Plaintiff told Progress on September 14 that Plaintiff would sue and sent a draft complaint for filing in the Eighth Judicial District Court, and after Plaintiff sent Progress a draft of this complaint on September 28 (¶¶ 34, 43). One of the two units smelled of animal urine and could not be used. Progress did not come to replace it on the date its technician gave. It collected the unit without advance notice on October 13, 2026, and did not replace it (¶¶ 39, 45, 51).

144. On information and belief, the officers, directors or managing agents responsible for each Defendant's conduct alleged in this Complaint knew of the condition and authorized or ratified that conduct.

145. This conduct was in conscious disregard of Plaintiff's rights and safety and was oppressive, fraudulent and malicious. Plaintiff seeks punitive damages against each Defendant.

## VII. PRAYER FOR RELIEF

Plaintiff requests judgment against the Defendants liable on each claim for:

1. Compensatory damages in an amount to be proven at trial, including diminished rental value and loss of use up to the full rent and mandatory fees paid for the tenancy, supplemental-cooling costs and moving costs;

2. On the Third Cause of Action, the additional statutory amount available for willful interruption of an essential service;

3. On the Tenth Cause of Action, the additional statutory amount available for retaliation;

4. On the Eighth Cause of Action, damages, equitable relief, costs and, if Plaintiff retains counsel, reasonable attorney's fees;

5. Punitive damages on the First, Second, Sixth, Seventh and Ninth Causes of Action;

6. Costs, interest as allowed by law, and reasonable attorney's fees if Plaintiff retains counsel; and

7. Any other relief the Court finds just.

Plaintiff pleads overlapping causes of action in the alternative and seeks a single recovery for each loss.

**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Dated: October 16, 2026

Respectfully submitted,

Anthony Mitchell
618 Painted Opus Place
North Las Vegas, Nevada 89084
(702) 884-0472
realanthonymitchell@gmail.com
Plaintiff, Pro Se